14-063735                              JJS:jmc                              #397

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DR. WILLIAM M. POLLACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: 08 C 1405 |
| | ) | |
| CUNNINGHAM FINANCIAL GROUP, | ) | Judge Hibbler |
| LLC, and JOHN DOES 1-10, | ) | Magistrate Judge Cox |
| | ) | |
| Defendants. | ) | |

**DEFENDANT, CFG's REPLY IN SUPPORT OF ITS MOTION
TO DISMISS COUNTS II AND III OF PLAINTIFF'S COMPLAINT**

This is a case brought by a private litigant relating to the transmission of alleged unsolicited

faxes. Such activity is governed by the TCPA which is the cause of action set forth in Count I of

plaintiff's Complaint. However, the purported sending of a few, unsolicited, faxes cannot, as the

plaintiff suggests, be pigeon-holed into the purview of the Illinois Consumer Fraud Act ("ICFA")

or be the subject of a common law cause of action for conversion.

The weakness of plaintiff's arguments are amply demonstrated by his heavy reliance on

numerous trial court orders, many of which are handwritten and consist of a single or a few pages,

that are devoid of any legal analysis or discussion of the issues at hand. (*See, e.g.,* Exs. D, G, H, J,

L, M, N, O to Pltf.'s Resp.). Plaintiff's legal authority is unimpressive, especially when it is

compared to the well-reasoned and thorough analysis contained in the decisions cited by CFG (most

of which are actually published). For each of these reasons as set forth more fully below, Counts II

and III of plaintiff's Complaint should be dismissed with prejudice.

## ARGUMENT

### I.    PLAINTIFF IS UNABLE TO STATE A VALID CLAIM FOR VIOLATION OF THE ICFA.

The ICFA distinguishes between "unfair" and "deceptive" conduct.  *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417, 775 N.E.2d 951 (2002).  Here, plaintiff does not allege the existence of any deceptive conduct.  Rather, it contends that the sending of a few, unsolicited faxes from an out-of-state location to an Illinois resident is "unfair."   This theory fails for three fundamental reasons: (1) the sending of unsolicited faxes does not satisfy the three prong test set forth in *Robinson* for determining whether an act constitutes an "unfair practice" under the ICFA; (2) CFG is not alleged to have intended that the sending of the facsimiles at issue be unfair to the plaintiff; and (3) plaintiff is unable to allege the CFG's activity occurred "primarily and substantially" in Illinois which is an essential element of his claim.

### A.    The Sending Of Unsolicited Faxes Is Not An "Unfair Practice" Under The ICFA.

Plaintiff concedes that in order to be considered an "unfair practice" under the ICFA, CFG's alleged transmission of the facsimiles at issue must satisfy the three prong test set forth by the Illinois Supreme Court in *Robinson*.[1]  Two of three judges in this district to consider the issue (Judge Grady and Judge Shadur) have held that have held that the sending of unsolicited faxes does *not* satisfy the three-part *Robinson* test, and therefore, does *not* constitute an unfair practice under the ICFA.  *See,*

---

[1]Plaintiff somewhat convolutes the issue by mischaracterizing CFG's discussion of *per se* violations of the ICFA.  CFG does not, as plaintiff suggests (*see*, Pltf.'s Resp., pp. 2-3), argue in its opening brief that the omission of the TCPA from the ICFA's list of *per se* violations bars a claim under the Act.  Rather, CFG correctly asserts that since the TCPA and Illinois' criminal statute prohibiting unsolicited fax advertising -- 720 ILCS 5/26-3 -- are *not* listed as *per se* violations, plaintiff must independently state a claim under Act by satisfying the *Robinson* test.  (*See*, CFG's Opening Mem., pp. 4-5).

*Western Railway Devices Corp.*, 2006 WL 1697119, * 4-6 (N.D. Ill.) (Copy attached in Appendix to CFG's Opening Mem. at Tab 1); *Rosario's Fine Jewelry, Inc. v. Paddock Publications*, 443 F.Supp.2d 976, 978-79 (N.D. Ill. 2006).

In *Western Railway*, Judge Grady held that the sending of an unsolicited fax advertisement did not rise to the level of immoral or oppressive conduct and did not cause consumers substantial injury. *Western Railway*, 2006 WL 1697119 at * 5-7. Judge Grady concluded that the sending of the unauthorized fax at issue could not be said to be immoral, oppressive or unscrupulous because it "included a 'remove' number that [the plaintiff] could use to avoid [receipt of] future facsimiles." *Id*. Judge Grady further explained that receipt of an unsolicited fax does not cause substantial injury to consumers because the plaintiff's cost of receiving and printing a fax advertisement is minimal and cannot be characterized as "significant harm." *Id*. at * 7.

In *Rosario's*, Judge Shadur concurred with the views expressed by Judge Grady in *Western Railway*. *Rosario's*, 443 F.Supp.2d at 979. Finding plaintiff's attempted application of the ICFA to claims involving the sending of unsolicited faxes to be "untenable," Judge Shadur held: "Of the three *Robinson*-identified factors, only the 'public policy' consideration is met, and the patent inapplicability of the other two factors to [plaintiff's] one-page fax advertisement heavily outweighs that one element in the evaluation called for by *Robinson*." *Id*. Judge Shadur also chose to give little weight to a number of non-binding Illinois trial court orders plaintiff had submitted in support of application of the ICFA to its claims, concluding that most of those orders were either devoid of analysis or actually had come to the opposite conclusion that fax advertising is outside the purview of the Act. *Id*.

Just as the plaintiff in *Rosario's*, the plaintiff here precariously rests his ICFA claim on

3

numerous trial court orders, most of which consist of a few pages, are wholly conclusory, and utterly devoid of legal analysis. (*See, e.g.,* Exs. D, G, H, J, O to Pltf.'s Resp.). Further, most of the cases that plaintiff cites which contain meaningful or detailed analysis of the issue have rejected the concept that the ICFA provides a cause of action for unsolicited fax advertising. *Whiting Corp. v. MSI Marketing*, No. 02 CH 6332, slip op. at 17-18 (Ill. Cir. Ct., April 3, 2003) (Attached to Pltf.'s Resp. as Ex. P); *see also, INSPE Associates, Ltd. v. Charter One Bank*, No. 02 CH 10965, slip op. at 19 (Ill. Cir. Ct., May 7, 2004) (Attached to Pltf's Resp. as Ex. B); *Zoes v. NorthAmerican Bancard, Inc.*, No. 03 CH 17879, slip op. at 9, n. 6 (Ill. Cir. Ct., Oct. 6, 2004) (Attached to Pltf.'s Resp. as Ex. C).

In *Whiting*, the court held that although the sending an unsolicited fax violates public policy, it is not immoral, unethical or oppressive, nor does it cause substantial injury to consumers. *Whiting*, at 17-18. After considering and weighing each of the *Robinson* factors, the court dismissed plaintiff's ICFA claim.[2] *Id.* In finding no immoral, unethical or oppressive conduct, the *Whiting* court stated:

> The plaintiffs allege the conduct is oppressive, yet they allege only one or two facsimile transactions to each plaintiff. This, by inference, suggests minimal disruption of one's business or occupation. The exhibits to the complaint show each plaintiff had a reasonable alternative to the receipt of additional messages. They could call to remove themselves from the list. This conduct does not rise to the level of oppression envisioned by the drafters of the ICFA. *Whiting*, at 17-18.

In finding no substantial injury, the *Whiting* court explained:

> The court acknowledges that the plaintiffs are not entitled to receive nominal or presumed damages in a claim under the ICFA. *Duran v. Leslie Oldsmobile, Inc.*, 229

---

[2] In concluding that Illinois' public policy against the sending of unsolicited faxes is not, by itself, enough to make the practice of fax advertising "unfair" under the ICFA, the court noted the absence of any *per se* prohibition against such advertising in § 2Z of the Act (815 ILCS 505/2Z). *Whiting*, at 18.

4

Ill.App.3d 1032, 1041 (1992). There are no facts from which the court can determine the amount of damages incurred by the suggested class plaintiff or consumers as a whole. The term "substantial is clearly a conclusion. *Whiting*, at 18.

The plaintiff in this case alleges that it received a few unsolicited faxes from CFG. Like the faxes at issue in *Western Railway, Rosario's,* and *Whiting*, the purported faxes in this case conspicuously displayed a telephone number that could be called to remove plaintiff from a fax list. (Exs. A-C to Cmplt.). Moreover, plaintiff does not allege any substantial injury. He cannot do so because the cost associated with the receipt of a few, unwanted faxes is admittedly mere pennies; hardly significant enough to give rise to an actionable ICFA claim.

Rather than focus its unfairness argument on the faxes and injury alleged *in this case*, plaintiff's response brief relies on facts and theories it has not even alleged in his Complaint, and which are entirely unrelated to CFG or the faxes it purportedly sent to him. For example, plaintiff places heavy reliance on an FCC citation against Fax.com concerning that company's practice of continuing to send faxes after receiving opt-out calls from consumers. (Pltf.'s Resp., pp. 4-5). There are no allegations in this case that CFG engaged in such a practice, and the findings against Fax.com are irrelevant to the alleged faxes at issue in these proceedings. Plaintiff's attempt to bolster the deficient allegations in his pleadings by citation to evidence against another party in a separate proceeding that has nothing to do with this case is entirely inappropriate.

Plaintiff also argues that the alleged fax at issue was "oppressive" because it inflicts "unavoidable injury" on the plaintiff unless it shuts off its fax machine. (Pltf.'s Resp., p. 4). The cases plaintiff cites for its "unavoidable injury" theory of oppression, *Elder v. Coronet Insurance Co.*, 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist 1990) and *People ex. rel. Fahner v. Hedrich*, 108 Ill.App.3d 83, 438 N.E.2d 924 (1st Dist. 1982) are irrelevant. First, it is not clear what plaintiff

means by "unavoidable injury," because the cases he cites do not use that term. Regardless, the conduct at issue in those cases was considered under the ICFA not because it imposed an "unavoidable injury" on the plaintiffs, but rather, because it was *coercive* and caused much more substantial injury than the loss of a few sheets of paper and negligible amount of toner.

In *Elder*, for example, the defendant insurance company required its insured to take a polygraph test regarding a claim he made on his policy before it would settle the claim. The insurer had not informed the insured of this requirement when he purchased the policy. The insurer denied the plaintiff's claim, allegedly based on the results of the polygraph test. *Elder*, 201 Ill.App.3d at 739-40. The court held that the insurer's exclusive reliance on the polygraph to deny the claim was oppressive because it "forces its insureds to file suit or to forego recovery although [defendant] possesses no admissible evidence that would create a triable issue in court," since polygraph are not admissible. *Id*. at 746. Thus, the decision was expressly based upon the coercive practices that the insurer imposed before and insured could be paid money it was owed.

Similarly, in *Hedrich*, the defendant owner of a mobile home park charged a $1,500 fee to owners of mobile homes who sold their homes unless the seller (or purchaser) removed the home from the lot. *Hedrich*, 108 Ill.App.3d at 86. The court found this practice oppressive because the fee was "unconscionably large for little or no services" and could only be extracted because the tenant-seller had no reasonable alternative but to pay the fee. *Id*. at 90. Again, the defendant essentially coerced the plaintiff into capitulating to its demands.

Neither *Elder* nor *Hedrich* are helpful to plaintiff's argument that CFG's conduct was oppressive. *See, Western Railway*, 2006 WL 1697119 at * 5. In both cases, the defendant used its power to coerce something from the plaintiff. By contrast, CFG here is only alleged to have sent

plaintiff advertisements *soliciting business*. There is nothing coercive about simply asking someone for business because the recipient can always say "no," or better yet, simply ignore the solicitation.

Plaintiff also argues that it satisfies the *Robinson* "substantial injury" factor because "[s]ending unsolicited faxes causes substantial injury to consumers." (Pltf.'s Resp., p. 6). In support, plaintiff again turns to the FCC proceedings brought against Fax.com in which the Commission found that "some businesses had received hundreds or thousands of fax advertisements in short periods." (Id. at p.5). As discussed above, Fax.com's practices have nothing to do with the conduct of CFG in this case, and plaintiff does not and cannot allege here that he received more than three faxes, much less "hundreds or thousands," from CFG. Equally irrelevant is plaintiff's citation to cases such as *People ex. rel. Hartigan v. Stianos*, 131 Ill.App.3d 575, 475 N.E.2d 1024 (2nd Dist. 1985), which was an enforcement action brought by the Illinois Attorney General, not an individual plaintiff, to address fraudulent tax charges imposed upon the public, a practice of financial gouging not even remotely similar to unsolicited fax advertising. *See, Western Railway*, 2006 WL 1697119 at * 6 (rejecting *Stianos* as support for the proposition that the sending of unsolicited faxes causes "substantial injury" due to the differences between public enforcement actions and private causes of action brought under the ICFA).

The other case cited by the plaintiff, *Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 2008 WL 597604 (N.D. Ill.), is easily distinguished. In that case, Judge Pallmeyer held that the sending of an unsolicited fax advertisement could be considered to be immoral, oppressive and unscrupulous because the fax at issue *did not* contain a "remove" number on the advertisement that the recipient could call to prevent the receipt of future faxes. *Centerline*, 2008 WL 597604 at * 8 (emphasis added). Here, in contrast, the faxes plaintiff allegedly received *do* contain a "remove"

number. (*See,* Exs. A-C to Cmplt.). As Judge Grady held in *Western Railway*, facsimiles which contain a "remove" number cannot be considered to be "oppressive" under the ICFA because they provide consumers with a meaningful choice they can use to avoid receipt of future faxes. *Western Railway*, 2006 WL 1697119 at * 5. Indeed, Judge Pallmeyer distinguished *Western Railway* in *Centerline* on this very basis. *Centerline*, 2008 WL 597604 at * 8.

The *Centerline* court also concluded that the sending of faxes may cause substantial injury to consumers because of the potential "aggregate harm" it may cause to "consumers or businesses as a group." *Centerline*, 2008 WL 597604 at * 9, n. 8. However, Illinois law is clear that in order for a practice to causes substantial injury to consumers it must cause significant harm to the plaintiff. *Rosario's*, 2006 WL 1697119 at * 6; *Garrett v. Rentgrow, Inc.*, 2005 WL 1563162, * 4 (N.D. Ill.) (A practice causes substantial injury to consumers [under the ICFA] if it causes significant harm to the plaintiff *and* has the potential to cause injury to a large number of consumers.") (emphasis added) (Copy attached in Appendix to CFG's Opening Mem. at Tab 5).

In *Centerline*, the court acknowledged that the practice of sending unauthorized faxes "cause[s] very little harm to the plaintiff." *Centerline*, 2008 WL 597604 at * 9, n. 8. Nevertheless, it concluded that regardless of whether, or to the extent, an alleged unfair practice harms the plaintiff, that practice may be considered to cause substantial injury if its "aggregate effect" amongst the population at large can be calculated to be substantial. *Centerline* does not cite any authority for such a proposition except *Robinson*. However, Robinson does not support this conclusion. Indeed, in *Robinson*, the Illinois Supreme Court specifically considered whether the harm *to the plaintiff* was significant in determining whether an alleged practice was "unfair." *Robinson*, 201 Ill.2d at 419-421. Further, the judge who decided *Centerline* (Judge Pallmeyer) has herself recognized in prior opinions

8

that whether an alleged unfair practice causes substantial injury is a two-part inquiry -- i.e., it must significantly harm the plaintiff *and* create the potential to cause harm to a larger number of consumers generally. *See, Wilson v. Harris N.A.*, 2007 WL 2608521, * 8 (N.D. Ill.) (Copy attached in Appendix to this Reply at Tab 1). Failure to apply both parts of that test was error.

The decision in *Centerline* also improperly presupposes class certification, which has not yet occurred, and in fact, may never occur in this case. *See, e.g., Freedman v. Advanced Wireless Cellular Communications, Inc.*, 2005 WL 2122304, * 2 (N.J. Super.) (denying class certification and noting that "[t]he majority of courts that have considered the vitality of class actions under the TCPA have similarly held that class actions [under the TCPA] are invalid.") (multiple citations omitted) (Copy attached in Appendix to this Reply at Tab 2). The Seventh Circuit has repeatedly held that before a class can be certified, a plaintiff must state a cause of action. *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1006 (7th Cir. 1993) ("Having no individual cause of action, [plaintiff] cannot represent a class."); *see also, Himmelman v. MCI Communications Corporation*, 2000 WL 976656, * 1 (D.D.C.) ("Considerations of potential harm to such a hypothetical class is simply too remote and speculative to justify reversing the proper dismissal of [plaintiff's] action.") (Copy attached in Appendix to this Reply at Tab 3).

Similarly, the Seventh Circuit has long prohibited aggregation of damages of putative class members to establish the amount in controversy requirement for diversity jurisdiction. *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 607 (7th Cir. 1997).[3] At this stage in the proceedings, the only issue is whether the *plaintiff* has stated a cause of action under the ICFA.

---

[3]The exception, of course, is the Class Action Fairness Act which permits aggregation if the amount in controversy would exceed $5 million. There is no indication from plaintiff's Complaint that the putative class is large enough to exceed this jurisdictional threshold.

If the named plaintiff has not stated a claim under the Act, it is irrelevant whether or not CFG has sent faxes that in the aggregate have caused significant damages to others which, in any event, are not alleged with any sort of detail from which their amount can be determined. *See, Western Railway*, 2006 WL 1697119 at * 6 ("Because [plaintiff] has failed to allege that it *personally* suffered substantial injury under the ICFA [resulting from the receipt of an unauthorized fax], its class allegations have no bearing on the instant motion [to dismiss].").

There is no material difference between plaintiff's ICFA claim in this case and the ICFA claim in *Western Railway, Rosario's* and *Whiting*. Those courts' dismissals of plaintiffs' ICFA claims were well-reasoned and correct, and this Court should follow their holdings.

**B.      The Complaint Does Not Allege That CFG Intended The Sending Of Facsimiles To The Plaintiff To Be "Unfair."**

As discussed in CFG's opening memorandum, plaintiff's complaint is devoid of allegations that CFG intended that the transmission of those faxes be unfair to him which is an essential element of his ICFA claim. *Garrett*, 2005 WL 1563162 at * 4. Plaintiff does not respond to this argument in his opposition brief, and therefore, has tacitly conceded it.

**C.      CFG's Conduct Is Not Alleged To Have Occurred "Primarily And Substantially" In Illinois.**

Plaintiff concedes that in order to be subject to the ICFA, a defendant's conduct must occur "primarily and substantially" in the State of Illinois. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill.2d 100, 185, 835 N.E.2d 801 (2005). However, it concludes that receipt of the alleged faxes at issue in Illinois is, in itself, sufficient to invoke the Act. (Pltf.'s Resp., pp. 9-10).

The fundamental problem with plaintiff's argument is that *Avery* itself makes it clear that focus solely on the place of injury is inappropriate. *Avery* states:

10

The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois. *Avery*, 216 Ill.2d at 185.

Here, all that is alleged is that CFG resides in Scottsdale, Arizona. Assuming CFG prepared or sent the faxes in question, this would have been done in Arizona, and plaintiff does not allege otherwise. Absent additional allegations that CFG engaged in some sort of activity in Illinois, CFG's alleged actions did not occur "primarily and substantially" in Illinois, and thus, are not subject to the ICFA.

## II.    THE SENDING OF UNSOLICITED FAXES IS NOT A CONVERSION OF PROPERTY.

Plaintiff's response to CFG's motion to dismiss the conversion claim re-hashes many of the ineffective arguments it has made in response to CFG's motion to dismiss the ICFA claim. For example, plaintiff inappropriately attempts to inflate its admittedly minuscule loss of a few sheets of paper and some toner by aggregating damages allegedly sustained by members of a putative class that has not been certified. In doing so, plaintiff again cites to public enforcement actions brought by government agencies or the Illinois Attorney General that simply have no application to this private civil suit.

In *Rosario's*, Judge Shadur considered the very issue now presented to this Court -- whether the sending of an unsolicited fax constitutes a conversion of the fax recipient's toner, ink or paper. *Rosario's*, 443 F.Supp.2d at 980. Answering this question in the negative, Judge Shadur explained that "it would impermissibly warp the concept of conversion if that label were to be attached to [plaintiff's] property (ink, toner and paper) that never came into [defendant's] possession at all -- that was never unlawfully held by [defendant] and as to which [defendant] could be said to have assumed

11

control, dominion or ownership over the property." *Id.* Judge Shadur further determined that no action for conversion lies for the sending of an unauthorized fax under the maxim of "*de minimus non curat lex*" since the loss of toner, ink and paper associated with the receipt of an unauthorized fax amounts to nothing more than trivial inconvenience or expense (in the court's words, mere "niggling"). *Id.*

In his response, plaintiff claims that *Rosario's* was wrongly decided, and in support, relies upon Judge Pallmeyer's decision in *Centerline*. *Centerline*, however, provides no meaningful response to Judge Shadur's holding that under the maxim of *de minimus non curat lex*, no conversion will lie for the consumption of plaintiff's admittedly minuscule amount of paper, toner and ink. As she did with respect to plaintiff's ICFA claim, Judge Pallmeyer merely determined that the amount of paper, toner, and ink consumed by unauthorized faxes *could* be substantial "in the aggregate" if the plaintiff's individual case is someday certified as a class action. *Centerline*, 2008 WL 597604 at * 10. But again, this analysis places the proverbial "cart before the horse." As previously discussed, it must first be determined that the plaintiff, and only the plaintiff, can state a cause of action before potential claims of putative class members are interjected into the analysis. Contrary to plaintiff's assertions, Judge Shadur's opinion in *Rosario's* was not wrongly decided; it correctly recognizes that the aggregation methodology (which was later employed in *Centerline*) violates well-established pleading rules and long-standing precedent for determining whether a plaintiff has a cause of action that will allow him to proceed with his claims.

Citing to § 226 of the Restatement (Second) of Torts, the *Centerline* court also concluded that even if the defendant never exercised dominion or control over plaintiff's paper, ink and toner, it could nevertheless be liable for conversion because "[a]ltering a chattel to materially change its

characteristics can constitute conversion, even if the defendant never comes into possession of the chattel." *Centerline*, 2008 WL 597604 at * 10.  However, *Centerline* ignores that § 226 only applies where a defendant has intentionally destroyed or radically damaged goods in another's possession in a way so as to materially change the identity of the chattel or its essential character.  *See, In re Star/ink Corn Products Liability Litigation,* 212 F.Supp.2d 828, 844 (N.D. Ill. 2002) *citing,* Restatement (Second) of Torts, § 226, Comment e.  The sending of a fax to solicit business cannot, by any stretch of the imagination, be construed as an act intended to destroy property.  Moreover, as the Supreme Court of Nevada held in *Edwards v. Emperor's Garden Restaurant*, 130 P.3d 1280, 1287 (Nev. 2006), the printing of a few unwelcome faxes falls well short of complete destruction or material alteration of the paper, toner and ink stored in plaintiff's fax machine.

The remaining authority plaintiff cites in support of his conversion claim primarily consists of a number of unreported Illinois trial court decisions.  The first case, *Mark Chair Co. v. Mortgage Managers, Inc.*, No. 02 LK 247 (Cir. Ct. Ill., Dec. 20, 2002), contains no analysis of any of the arguments defendants have raised in support of dismissal of plaintiff's conversion claim.  The trial court order merely states: "Count II of plaintiff's complaint states a cause of action sounding in conversion." (*See,* Ex. G to Pltf.'s Resp., p. 3).  This conclusory statement is of no use to this Court in addressing CFG's arguments.

Another trial court decision cited by the plaintiff is Judge McGann's opinion in *INSPE Associates, Ltd. v. Charter One Bank*, No. 02 CH 10965, slip op. at 19 (Ill. Cir. Ct., May 7, 2004). After rejecting plaintiff's blast faxing case brought pursuant to the ICFA, Judge McGann relegated his discussion of the conversion claim at issue in that case to a single paragraph. More importantly, he had no occasion to consider the arguments in support of dismissal of the conversion claim that

CFG has raised in this case. In *INSPE Associates, Ltd.*, the defendant argued that a fax could not be the subject of a conversion because the plaintiff had relinquished control over its property by placing paper and toner in its fax machine -- in other words, plaintiff had no right to immediate possession of those items. *INSPE Associates, Ltd.*, at 18. In rejecting this argument, Judge McGann stated:

> The gist of the bank's argument appears to be that, by placing paper in a fax machine, an owner is parting with control, dominion or ownership of that property. By analogy, the Court surmises, if one were to leave their bicycle on the front porch for friends to see and the newspaper delivery person decided it would be handy and *takes it*, there would no *theft*." *Id.* (emphasis added).

Here, CFG's argument is not based upon plaintiff's relinquishment of control over its paper and toner, but rather, the fact that CFG never gained possession or control of that property. In other words, CFG maintains that by sending a fax it could not and did not ever wrongfully assume control, dominion or ownership over the plaintiff's property. *Craig v. Citicorp Savings*, 219 Ill.App.3d 142, 148, 578 N.E.2d 1331 (5th Dist. 1991). To use Judge McGann's analogy, CFG's argument is not predicated upon plaintiff's placing the bicycle on the porch, but rather, that the defendant never *took* the bicycle off the porch. The mere act of sending a fax does not involve any taking, possession or control over the fax recipient's property in any way shape or form. *Rosario's*, 443 F.Supp.2d at 980. This argument was not raised or addressed in *INSPE Associates, Ltd.*

More importantly, *INSPE Associates, Ltd.* did not address the argument that plaintiff cannot state a claim for conversion where, as here, it is unable to allege that it suffered anything more than trivial inconvenience or expense. In *Rosario's*, Judge Shadur determined that the loss of ink or toner associated with the receipt of an unauthorized fax is *de minimus*, and thus, cannot support a conversion claim. Similarly, in *Edwards*, the Supreme Court of Nevada held that the sending of an unsolicited fax advertisement does not constitute a conversion of property because "conversion

generally is limited to those severe, major, and important interferences with the right to control

personal property that justify requiring the actor to pay the property's full value." *Edwards*, 130 P.3d

at 1287-88. At the time Judge McGann rendered his decision in *INSPE Associates, Ltd.*, he did not

have the benefit of *Rosario's* or *Edwards*.

*Rosario's* and *Edwards'* holdings are based upon § 222A of the Restatement of Torts, which

is the same authority Illinois follows in determining what constitutes a conversion. *See, South

Central Bank and Trust Company, v. Citicorp Credit Services, Inc.*, 811 F.Supp. 348, 353 (N.D. Ill.

1992); *In re Thebus*, 108 Ill.2d 255, 259, 483 N.E.2d 1258, 1260 (1985); *De Kalb Bank v. Purdy*,

205 Ill.App.3d 62, 77, 562 N.E.2d 1223 (2nd Dist. 1990). Plaintiff does not and cannot attack the

*Edwards* court's application of § 222A in holding that the sending of a fax is simply not a conversion

of another's property as a matter of law. The analysis in *Rosario's* and *Edwards* is well-reasoned,

thoughtful and correct. This Court should follow these cases and dismiss plaintiff's conversion

claim with prejudice.

### CONCLUSION

For each of the foregoing reasons, as well as those set forth in CFG's opening memorandum,

Counts II and III of plaintiff's Complaint should be dismissed with prejudice.

Respectfully submitted,

s/ James J. Sipchen
James J. Sipchen Bar Number:6226113
PRETZEL & STOUFFER, CHARTERED
One South Wacker Drive; Suite 2500
Chicago, Illinois 60606
Telephone  (312) 578-7422
Fax:  (312) 346-8242
E-Mail:  jsipchen@pretzel-stouffer.com

15

## CERTIFICATE OF SERVICE

The undersigned certifies that Defendant, CFG's Reply in Support of its Motion to Dismiss

Counts II and III of Plaintiff's Complaint was filed electronically this **8th** day of **May**, 2008.  Notice

of this filing will be sent to all parties by operation of the Court's electronic filing system and by

U.S. Mail (only where indicated below).  Parties may access this filing through the Court's electronic

system.

Heather Kolbus
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200
E-Mail: hkolbus@edcombs.com

s/ James J. Sipchen
James J. Sipchen  (IL Bar No. 6226113)
Pretzel & Stouffer, Chartered
One South Wacker Drive - Suite 2500
Chicago, Illinois 60606
Telephone:     (312) 578-7422
Fax:              (312) 346-8242
E-Mail:          jsipchen@pretzel-stouffer.com
*Attorneys for Defendant,*
*Cunningham Financial Group, LLC*

16

## CERTIFICATE OF SERVICE

The undersigned certifies that Defendant, CFG's Reply in Support of its Motion to Dismiss Counts II and III of Plaintiff's Complaint was filed electronically this      day of      , 2008. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and by U.S. Mail (only where indicated below).  Parties may access this filing through the Court's electronic system.

Heather Kolbus
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200
E-Mail: hkolbus@edcombs.com

s/ James J. Sipchen
James J. Sipchen  (IL Bar No. 6226113)
Pretzel & Stouffer, Chartered
One South Wacker Drive - Suite 2500
Chicago, Illinois 60606
Telephone:     (312) 578-7422
Fax:               (312) 346-8242
E-Mail:          jsipchen@pretzel-stouffer.com
*Attorneys for Defendant,*
*Cunningham Financial Group, LLC*

16

# APPENDIX

*Pollack v. Cunningham Financial Group LLC and John Does 1-10*
Court No. 08 C 1405

### INDEX OF CASES TO DEFENDANT, CFG's REPLY IN SUPPORT OF ITS
### MOTION TO DISMISS COUNTS II AND III OF PLAINTIFF'S COMPLAINT

**Case Name**                                       **Tab #**

*Wilson v. Harris N.A.*,
    2007 WL 2608521, * 8 (N.D. Ill.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Freedman v. Advanced Wireless Cellular Communications, Inc.*,
    2005 WL 2122304, * 2 (N.J. Super.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Himmelman v. MCI Communications Corporation*,
    2000 WL 976656, * 1 (D.D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# TAB 1

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2608521 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2608521)

**C**

Wilson v. Harris N.A.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                      Division.
             Myrtle WILSON, Plaintiff,
                         v.
              HARRIS N.A., Defendant.
                 **No. 06 C 5840.**

                  Sept. 4, 2007.

Daniel A. Edelman, Tara Leigh Goodwin, Deborah
Anne Morgan, Edelman, Combs, Latturner &
Goodwin, LLC, David Anthony Rodriguez, Chica-
go, IL, for Plaintiff.
Richard Alan Wohlleber, Stephen Todd Sipe, Chap-
man & Cutler, Chicago, IL, for Defendant.

        *MEMORANDUM OPINION AND ORDER*

REBECCA R. PALLMEYER, United States Dis-
trict Judge.
*1 Plaintiff Myrtle Wilson maintains a checking ac-
count with Defendant Harris N.A. ("Harris Bank").
In October 2005, Wilson complained to Harris
Bank that fifteen allegedly unauthorized transac-
tions had diminished the balance in her checking
account. Harris Bank's subsequent investigation in-
to Wilson's complaint (or lack thereof) is the basis
for this action. Wilson claims that, in the aftermath
of her complaint, Harris Bank violated provisions
of the Electronic Funds Transfer Funds Act
("EFTA"), 15 U.S.C. § 1693 *et seq.;* the Illinois
Consumer Fraud and Deceptive Practices Act
("ICFA"), 815 ILCS 505/1 *et seq.;* and § 407(a) of
the Social Security Act. Harris Bank has moved to
dismiss all but one of Wilson's claims for failure to
state a claim. For the reasons explained below, Har-
ris Bank's motion to dismiss is granted in part and
denied in part.

                   *BACKGROUND*

**A. Harris Bank's Investigation of the Allegedly
Unauthorized Transactions**

On October 12, 2005, Myrtle Wilson visited two
different ATM machines and attempted to withdraw
money from her Harris Bank checking account us-
ing her Harris Bank debit card. (Compl.¶ 5.) Both
transactions were declined. (*Id.*) Later that day,
when Wilson called Harris Bank to ask why her
debit card had been declined, a bank employee ex-
plained that her checking account was overdrawn.
(*Id.* ¶ 6.) On October 13, 2005, Wilson visited a
Harris Bank branch and learned that her account
had been diminished by fifteen unauthorized trans-
actions. (*Id.* ¶ 7.) Thirteen of these were debit card
transactions executed on October 7, 2005 and Octo-
ber 11 and 12, 2005; five of the debit card transac-
tions occurred at "Food 4 Less," seven occurred at
"Sam's Gas," and one at "Marathon." (*Id.*) Two of
the transactions were "forced checks" dated Octo-
ber 14, 2005.[FN1](*Id.*) Together, these transactions
diminished Wilson's account by \$1,111.67. (*Id.*) In
response to this information, Wilson executed three
affidavits stating that she had not authorized the
merchant transactions. She also notified Harris
Bank of the two "forced checks." (*Id.* ¶ 8.) In addi-
tion, Wilson filed a report with the Chicago Police
Department.(*Id.* ¶ 9.) On that same day, October 13,
Wilson faxed the affidavits and the police report to
the Bank's ATM Adjustment Processing Unit so
that it could begin investigating the
transactions.FN2(*Id.* ¶ 10.)

> FN1. Neither party explains what Plaintiff
> means by "forced check." Because this ex-
> pression appears more than once in the
> complaint, the court presumes that
> "forced" is not a misspelling of "forged"
> and that it may instead mean "post-dated."

> FN2. Wilson has not explained why she
> executed three affidavits; perhaps there
> was one such affidavit for each of the three
> merchants involved in the unauthorized

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2608521 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2608521)**

transactions.

In a letter dated October 28, 2005, Harris Bank advised Wilson that it was denying her claim. (*Id.* ¶ 11.)The unsigned letter, a copy of which is attached to Defendant's motion to dismiss, did not state the reason for the denial, did not describe the nature of the investigation, and did not indicate when the Bank's investigation was completed. (10/28/05 Letter, Ex. A to Harris N.A.'s Motion to Dismiss Pursuant to Rule 12(b)(6) ("Def.Mot.").) Shortly thereafter, Wilson requested that the Bank send her the documents it relied upon in making this determination. (Compl.¶ 12.) Harris Bank employee Anna Chavez called Wilson on December 1, 2005 and promised to send her the requested documents. (*Id.*) The Bank did not in fact do so until May 2006. On May 9, 2006, Stacy Bond of the Harris Bank sent Wilson's attorney a letter [FN3] explaining that Wilson's claim was denied because all of the transactions at issue required both Wilson's ATM card and PIN number; as Wilson had "repeatedly stated" that she was the only person who had access to her ATM card and PIN number during the relevant time period, the Bank concluded that Wilson must have authorized the transactions in question. (*Id.* ¶ 13; 5/9/06 Letter, Ex. B. to Def. Mot.) This letter also noted that there was no evidence to suggest that a "sophisticated scam of some sort caused the unauthorized disclosure of Ms. Wilson's PIN or debit card number."(5/9/06 Letter.)

> FN3. The letter dated May 9, 2006 states that it is in response responding to a letter sent on April 7, 2006 by Wilson's attorney. (5/9/06 Letter, Ex. B. to Def. Mot.) The parties have provided no information about the April 7, 2006 letter.

**B. Harris Bank's Compliance with U.S. Department of Treasury Advisory Letter**

**\*2** Wilson alleges that the Bank's investigation did not follow the directives contained in an advisory letter issued by the U.S. Department of the Treasury, Office of the Comptroller of the Currency

("OCC") in September of 2001. (Compl.¶¶ 14-19.) This letter "promulgated actions a financial institution should take to ensure its investigations comply with the bank's EFTA obligations," and expressed concern that "some banks may be rejecting claims of unauthorized transactions solely because the customer's [ATM] card or debit card and [PIN] number were used in the transaction, and the customer supplied no information indicating that the card or PIN was misplaced."(*Id.* ¶¶ 14-15.)The letter informed banks that they "must take steps to investigate whether there are indications that unauthorized use occurred," (OCC Advisory Letter, Ex. D. to Def. Mot.), and set forth the following factors that a bank might consider in making a reasonable investigation:

Documentation or written, signed statements provided by the customer.

Historical information on the customer's pattern of use (e.g ., time, frequency, location, and types and amounts of transactions).

Location of the transaction in relation to the customer's residence, place of business, or normal shopping locations.

Customer's location at the time of the unauthorized transaction.

Problems reported by other customers regarding the access device or ATM.

Signature information on point of sale transactions.

Police reports, if available.

Film from security cameras, if available.

(Compl. ¶ 16; OCC Advisory Letter, at 2.)

Wilson asserts that the explanation provided by Harris Bank on May 9, 2006 shows that the Bank did not inquire into Wilson's pattern of use, did not view relevant security camera footage, and did not consider her whereabouts at the time of the transac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2608521 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2608521)

Page 3

tions. (*Id.* ¶¶ 17-19.)Had the Bank conducted such an investigation, Wilson alleges, it would have discovered that Wilson is eighty years old and wheelchair-bound, and that she had only used her debit card in the past for ATM withdrawals, not for consumer purchases like the transactions at issue. (*Id.* ¶ 17.)Moreover, Wilson alleges, in an appropriate investigation the Bank would have discovered that she had never used her card at any of the relevant merchants; that two of the merchants are gas stations, where Wilson, who does not have a driver's license or own a car, would not do business; and that Wilson was most likely at home during the transactions at issue. (*Id.* ¶¶ 17, 19.)

### C. Wilson's Diminished Social Security Funds

On October 25, 2005, Wilson's checking account had a negative balance of $988.70 as a result of the alleged unauthorized transactions. (*Id.* ¶ 21.)At that time, Wilson's only source of income was her monthly Social Security payment of $928. (*Id.*) On November 3, 2005, Wilson's Social Security payment was automatically deposited into her checking account; this was the only money deposited into her account in November 2005. (*Id.*) Also in November 2005, Harris Bank charged Wilson $60.70 in overdraft fees by taking this amount from the Social Security funds on deposit. (*Id.*) Wilson claims she suffered the following economic harm from Defendant's denial of her claim that the transactions were unauthorized and the Bank's use of her Social Security benefits to pay overdraft fees: She was required to borrow money to pay her rent, ask others to purchase her food, cancel her telephone service and doctors' appointments, and spend money on cab fare.[FN4](*Id.* ¶ 22.)

> FN4. Wilson has not explained how the denial of her claim forced her to spend money on cab fare.

**\*3** Wilson filed this six-count complaint against Harris on November 7, 2006. In Count I, the only count not challenged in this motion, Wilson alleges

that Harris Bank's failure to adequately investigate the transactions violated the EFTA's error resolution procedures as set forth in 15 U.S.C. § 1693f and the Act's enacting legislation, 12 C.F.R. § 205.11. (*Id.* ¶¶ 23-27.)Harris has moved to dismiss the remaining counts: Count II alleges that Harris Bank is liable for treble damages under § 1693f of the EFTA because it did not provisionally recredit her bank account while conducting its investigation and did not make a good faith investigation into the allegedly unauthorized transactions. (*Id.* ¶¶ 28-31.)Count III also alleges that Harris Bank is liable for treble damages under § 1693f because the bank failed to recredit Wilson's account and "did not have a reasonable basis for believing that the plaintiff's account was not in error."(*Id.* ¶¶ 32-35.)Count IV alleges that Wilson is entitled to treble damages under § 1693f(e) (2) because Harris Bank "knowingly and willfully decided that the plaintiff's account was not in error" when such a conclusion was not reasonable. (*Id.* ¶¶ 36-38.)Count V alleges that Harris Bank's failure to conduct an adequate investigation into Wilson's claim constituted an "unfair practice" in violation of the ICFA.(*Id.* ¶¶ 39-48.)Finally, Count VI alleges that Harris Bank's use of Wilson's automatically deposited Social Security funds to pay her overdraft fees violated § 407(a) of the Social Security Act. (*Id.* ¶¶ 49-53.)[FN5]The court discusses Harris Bank's arguments for dismissal below.

> FN5. Wilson erroneously labeled her claim under the Social Security Act as Count VI I but the court will refer to it as Count VI.

### *DISCUSSION*

To withstand a motion to dismiss, a complaint need not plead specific facts; rather, it "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"*Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)). When ruling on a motion to dismiss for failure to state a claim,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2608521 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2608521)

Page 4

the court accepts "as true all of the factual allegations contained in the complaint."*Id.* (citations omitted).

**A. Claims Under the Electronic Funds Transfer Act (Counts II, III, and IV)**

Wilson brings Counts II, III and IV under the EFTA. The EFTA includes a variety of directives from Congress on how financial institutions should handle alleged errors stemming from the electronic transfer of funds. *See*15 U.S.C. § 1693f. Under § 1693f(a), when a consumer notifies a financial institution that the consumer believes his or her account has been debited in error, the "institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days."*Id.* § 1693f(a)(3). If the financial institution determines that an error did occur, it must credit the consumer's account, with interest, within one business day of making that determination. *Id.* § 1693f(b). If the financial institution is unable to complete its investigation within ten business days after receiving notice of a complaint, it must "provisionally recredit the consumer's account for the amount alleged to be in error, ..., including interest where applicable, pending the conclusion of its investigation."*Id.* § 1693f(c). If, after investigation, the financial institution determines that an error did not occur, "it shall deliver or mail to the consumer an explanation of its findings within [three] business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur."*Id.* § 1693f(d).

*4 The Act provides for an award of treble damages for certain violations of these provisions. Treble damages are available if the institution fails to provisionally recredit a consumer's account when the investigation took longer than ten business days, and the institution: (A) "did not make a good faith

investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error."*Id.* § 1693f(e)(1). Treble damages are also available to a consumer when the financial institution "knowingly and willfully conclude[s] that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation."*Id.* § 1693f(e)(2).

**1. Counts II & III**

Harris Bank has moved to dismiss Counts II and III. In both counts, Wilson alleges that she is entitled to treble damages under § 1693f(e)(1) because the Bank did not "provisionally recredit the plaintiff's checking account within the ten-day period specified" in § 1693f(c), and did not: (1) "make a good faith investigation into the unauthorized transactions" (Count II), or (2) "have a reasonable basis for believing that the plaintiff's account was not in error" (Count III). Harris Bank argues that these claims are based on the faulty premise that the Bank was required to provisionally recredit Wilson's account, a finding that is necessary to an award of treble damages under § 1693f(e)(1). (Def.Mot.¶ 16.) According to the Bank, it notified Wilson of the results of its investigation within the required time frame and therefore cannot be held liable for treble damages under § 1693f(e)(1).(*Id.* ¶ 15.)Wilson asserts, in response, that because Harris Bank's determination was made after the ten-day deadline set forth in § 1693f(a), the Bank was required to provisionally recredit her account. (Plaintiff's Response to Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) ("Pl.Resp.") at 2.)

The parties agree that Wilson brought her claim to the Bank's attention on October 13, 2005, and was advised that her claim was denied in an October 28, 2005 letter. According to Wilson, the fact that the notice was issued eleven business days after she notified the Bank of the alleged unauthorized transactions is sufficient to establish that the Bank's invest-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2608521 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2608521)

Page 5

igation was not timely under § 1693f(a) and that the Bank was therefore required to provisionally re-credit her account. (Pl. Resp. at 2-3.) Harris Bank contends that the EFTA's provisions are ambiguous: Section 1693f(a) can be read to require that both the investigation and notice of results be completed within ten business days, while § 1693f(d) appears to allow a full ten-day period for the financial institution to investigate the claim, followed by notice to the consumer of its determination "within three business days after the conclusion of its investigation."(Harris N.A.'s Reply in Support of its Motion to Dismiss Pursuant to Rule 12(b)(6) ("Def.Reply") at 3-4.) The EFTA's implementing regulation, 12 C.F.R. § 205.11(c)(1), adopts the more generous schedule. It states that the institution must determine whether an error occurred within ten business days and report the results to the consumer "within three business days after completing the investigation."Thus, Harris Bank argues, its notification to Wilson, eleven business days after she submitted her complaint, complies with § 1693f(d) and the EFTA's implementing regulation. (Def. Reply at 3-4.) [FN6]

> FN6. In Harris Bank's reply, the Bank quotes language from § 1693f(d) but cites to § 1693f(c). The court assumes the Bank intended to cite to § 1693f(d).

**\*5** The court agrees with the Bank that the language of § 1693f(a) and § 1693f(d) generate some uncertainty concerning the timeline for investigation and notification that financial institutions must follow in order to avoid the obligation of recrediting the consumer's account. In such circumstances, the court can seek clarification in the relevant agency's interpretation of the statute. *See Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (collecting cases) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.") If the statute is ambiguous, as is the case here, the court will defer to the agency's interpretation as long as the regulation the agency has promulgated is a reasonable reading of the statute. *Bankers Life & Cas. Co. v. United States,* 142 F.3d 973, 983 (7th Cir.1998) (describing the two-step analysis involved in *Chevron*-deference: first, the court must examine the text of the statute to see if the plain meaning of the statue supports or opposes the regulation, and, second, if the statute is ambiguous, the court examines the reasonableness of the regulation, granting deference to agency interpretations that are reasonable).

As explained above, 12 C.F.R. § 205.11(c)(1) states that a "financial institution shall investigate promptly and ... shall determine whether an error occurred within ten business days of receiving a notice error," and the "institution shall report the results to the consumer within three business days after completing its investigation."Because this language is consistent with one of the two statutory provisions, § 1693f(d), the court concludes that the agency interpretation is reasonable. The court will therefore measure the Bank's response to Wilson's claim under the ten days/three days schedule set forth in the regulation. Wilson insists that the Bank failed to comply even with this more generous interpretation of its obligations: She presented her claim on October 13, and the Bank sent notice that her claim was denied on October 28. Although that notice came on the eleventh business day after she presented her claim, Wilson argues, the Bank has not demonstrated that it actually completed the investigation within the ten-day period allowed for the investigation. (Pl. Resp. at 3.)

The court acknowledges the possibility that the Bank did not in fact complete its investigation within ten days. The Bank could have completed its investigation on the same day that it notified Plaintiff of the denial-October 28, eleven business days after receiving her claim. The court acknowledges, further, that dismissal of the complaint on motion is appropriate only if no set of facts consistent with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2608521 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2608521)

the allegations would support a claim for relief. The court is nevertheless reluctant to adopt Plaintiff's theory that, even without a specific allegation of wrongdoing, the Bank has an obligation, at the pleading stage, to present affirmative evidence of its compliance with the regulation. Wilson's complaint does not allege that the Bank's investigation was not timely, nor has she even asserted that the Bank *completed* its investigation on the eleventh day. Without such allegations, the complaint does not give Harris Bank fair notice of the grounds on which Wilson's claims for treble damages in Counts II and III rest. The Bank's motion to dismiss Counts II and III is granted.

**2. Count IV**

*6 Count IV of Wilson's complaint alleges that Wilson is entitled to treble damages under 15 U.S.C. § 1693f(e)(2) because Harris Bank "knowingly and willfully decided that the plaintiff's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to Harris Bank at the time of its investigation."(Compl.¶ 37.) Harris Bank has moved to dismiss this claim, stating only that the complaint "provides no basis suggesting that Harris engaged in any knowing or willful misconduct."(Def.Mot. ¶ 17.) Wilson points out, correctly, that § 1693f(e)(2) does not require her to plead that Harris Bank engaged in "knowing and willful misconduct" as the Bank contends. (Pl. Resp. at 4.) Rather, § 1693f(e)(2) requires only that the Bank "knowingly and willfully *concluded* that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence *available to the institution at the time of its investigation."*15 U.S.C. § 1693f(e)(2) (emphasis added).FN7 The court concludes Wilson's allegations are sufficient in this regard.

> FN7. In Plaintiff's brief, she states in passing that § 1693f(e)(2) requires that a financial institution provisionally recredit a consumer's account within the ten-day

period after the institution receives notice of the consumer's complaint. Plaintiff did not make such allegations in her complaint, however, and under the court's reading of the plain language of § 1693f(e), only § 1693f(e) (1)-not § 1693f(e)(2)-requires that the financial institution provisionally recredit a consumer's account within the specified period. Thus, the court will not discuss the Bank's failure to provisionally recredit Plaintiff's account in connection with Count IV.

Wilson alleges, based on the Bank's explanation for the denial of her claim, that it did not investigate her past ATM use, review security footage of the transaction points, or look into Wilson's whereabouts at the time of the transactions. (Compl.¶¶ 17-19.) It is reasonable to assume that such evidence would have been available to the Bank at the time of its investigation. Moreover, Wilson alleges that had the Bank undertaken such inquiries, it would have discovered facts at odds with its conclusions: Wilson is eighty years old and wheelchair bound; she has never used her debit card at any of the relevant merchants or, indeed, for any consumer purchases of the type at issue here; she does not do business at gas stations; and she was most likely at home during the transactions at issue. (*Id.*) When construed in Wilson's favor, these allegations are sufficient to establish, for the purpose of this motion to dismiss, that it was unreasonable for the Bank to have concluded that her account was in error. Because Wilson also alleged that the Bank "knowingly and wilfully decided that the plaintiff's account was not in error ...," (Compl.¶ 37), the court concludes that Wilson has stated a claim in Count IV.

**C. Claim under the Illinois Consumer Fraud and Deceptive Practices Act (Count V)**

Count V alleges a violation of the ICFA. (Compl.¶¶ 39-48.) According to the complaint, Harris Bank's failure to conduct an adequate investigation into the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleged unauthorized transactions constitutes an un-fair practice that violates the ICFA and "offends public policy, is immoral, unethical, oppressive and unscrupulous, and substantially harms consumers."(*Id.* ¶¶ 44-45.)Wilson further alleges in Count V that the Bank's conduct was "willful, wan-ton and in reckless disregard of the rights of oth-ers," entitling her to punitive damages. (*Id.* ¶ 48.)Harris Bank has moved to dismiss this count, arguing that claims under the ICFA must be stated with factual particularity and that Wilson does not allege any specific facts to support that the Bank engaged in an unfair practice under the ICFA or that the Bank's conduct was "willful, wanton and in reckless disregard of the rights of oth-ers."(Def.Mot.¶¶ 21-22.)

*7 In order to state claim under the ICFA, a plaintiff must allege: "(1) a deceptive act or prac-tice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the de-ception occurred in the course of conduct involving trade and commerce."*Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 501, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996) (citing *Siegel v. Levy Org. Dev. Co.,* 153 Ill.2d 534, 542, 180 Ill.Dec. 300, 607 N.E.2d 194 (1992)). A plaintiff may allege conduct that is unfair but not deceptive. *See Saunders v. Mich. Ave. Nat'l Bank,* 278 Ill.App.3d 307, 313, 214 Ill.Dec. 1036, 662 N.E.2d 602, 608 (1st Dist.1996).

The court first considers the adequacy of Plaintiff's ICFA allegations. Harris contends that claims under the ICFA must be stated with "factual particularity and specificity," and Wilson does not argue other-wise. (Def.Mot.¶ 20.) FN8The alleged unfair prac-tice here is the Bank's investigation of her com-plaint of unauthorized withdrawals from Wilson's checking account. (Compl. ¶ 44 ("Defendant's fail-ure to conduct an adequate investigation into plaintiff's claim is an unfair practice in violation of the Illinois Consumer Fraud Act").) The court con-cludes that Wilson's allegations concerning this practice are sufficiently specific: Her complaint

identifies the alleged unauthorized transactions; ex-plains when and how she informed the Bank of her claim; sets forth her subsequent communications with the Bank regarding the alleged unauthorized transactions and the content of those communica-tions; and notes the actions the Bank declined to take in its investigation of the alleged unauthorized transactions. (*Id.* ¶¶ 8-13, 17-19, 214 Ill.Dec. 1036, 662 N.E.2d 602.)

> FN8. At least some authority suggests that when a claim under the ICFA is based on an unfair practice, rather than a deceptive one, there is no heightened pleading re-quirement. *See Strohmaier v. Yemm Chev-rolet,* 211 F.Supp.2d 1036, 1043 (N.D.Ill.2001) ("[S]ome claims that arise under the ICFA may not be fraud claims and may fall outside the scope of Rule 9(b)"); *Gaddy v. Galarza Motor Sport L.T.D,* No. 00 C 3893, 2000 WL 1364451, *4 (N.D.Ill. Sept.20, 2000) (citation omit-ted) (Rule 9(b)'s pleading standards "inapplicable" because the ICFA "prohibits not only fraud, but a broad array of unfair practices"). Because, as discussed in the text, Wilson's allegations meet a heightened pleading standard, the court need not consider whether such a standard is necessarily imposed here.

The court is, therefore, satisfied that Wilson has pleaded the circumstances surrounding the Bank's alleged unfair practice with sufficient particularity. The Banks has also suggested, however, that Wilson's allegations are insufficient because she has not specifically asserted that the Bank engaged in a deceptive or unfair practice. To determine whether an act is unfair within the meaning of the ICFA, courts consider: "(1) whether the practice of-fends public policy; (2) whether it is immoral, un-ethical, oppressive, or unscrupulous; [and] (3) whether it causes a substantial injury to con-sumers."*Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 402, 417, 775 N.E.2d 951, 961 (2002)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(citing *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). A plaintiff need not assert that all three of these factors are met. " 'A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'"*Robinson,* 201 Ill.2d at 418, 266 Ill.Dec. 879, 775 N.E.2d at 961 (quoting *Cheshire Mortg. Serv., Inc. v. Montes,* 223 Conn. 80, 106, 612 A.2d 1130, 1143 (1992)).

The court concludes Wilson's allegations are adequate in this regard, as well. In making this determination, the court considers whether the Bank's alleged practices offend public policy as reflected in "statutes, the common law, or otherwise-whether, in other words, [the challenged conduct] is within at least the penumbra of some common-law statutory, or other established concept of unfairness."*Sperry & Hutchinson Co.,* 405 U.S. at 244 n. 5;*see also Griffin v. Universal Cas. Co.,* 274 Ill.App.3d 1056, 1069, 211 Ill.Dec. 232, 654 N.E.2d 694, 703 (1st. Dist.1995) (citations omitted) (applying standard set forth in *Sperry & Hutchinson Co.*). Though the relevant public policy in this case has not been formally established by statute or common law, Wilson has alleged that the Bank's investigation of her claim failed to meet the standards of fairness set forth in the OCC's advisory letter. That letter, issued to financial institutions on September 7, 2001, addressed precisely the circumstances that Wilson claims are at issue here: a customer complaint of unauthorized transactions where the customer's debit card and personal identification number were used in the transaction and the customer supplied no information to indicate that her card or identification number were misappropriated. (Compl.¶¶ 14-15.) Indeed, the letter specifically instructs that "banks cannot assume that they have satisfied their duty to investigate simply by concluding that the customer's debit card and PIN were used in the transaction at issue."Yet, according to Wilson's allegations, the Bank made this precise assumption when it denied her claim. (OCC Advisory Letter; Compl. ¶ 13.) And, although the

court does not read the advisory letter to require the Bank to take every one of the recommended investigative steps, Wilson has alleged that the Bank in fact took none of the actions counseled by the OCC's letter. (OCC Advisory Letter; Compl. ¶¶ 17-19.)

**\*8** The court concludes Wilson's allegations also satisfy the remaining two bases for concluding that a practice is "unfair" within the meaning of ICFA-a showing that the practice at issue is "immoral, unethical, oppressive or unscrupulous" or that it "causes a substantial injury to consumers."*Robinson,* 201 Ill.2d at 417, 266 Ill.Dec. 879, 775 N.E.2d at 961 (citation omitted). Wilson's allegations are sufficient to raise an inference that the Bank's conduct was oppressive. According to the complaint, without conducting any significant investigation, and despite the availability of evidence that strongly suggests the transactions were unauthorized, the Bank rejected Wilson's claim and failed to provide any explanation of the reasons for the denial for six months. (Compl.¶¶ 11-13, 17-19.) The complaint also sufficiently alleges a substantial injury to consumers. "A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers."*Garrett v. RentGrow, Inc.,* No. 04 C 8309, 2005 WL 1563162, *4 (N.D.Ill. July 1, 2005) (citation omitted). Wilson asserts that that she was deprived of her only source of income for more than a month as a result of the Bank's conduct. (Compl. ¶ 47 .) Given that Harris Bank is alleged to have more than two hundred branches in the Chicagoland area and northwest Indiana, (*id.* ¶ 4), the court can reasonably infer that its large consumer base may be at risk of being subjected to cursory and inadequate investigations of claims of unauthorized transactions.

Finally, Harris Bank contends that it cannot be liable for punitive damages because "Plaintiff fails to allege any particular or specific facts suggesting that Harris engaged in conduct that was 'willful, wanton and in reckless disregard of the rights of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2608521 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2608521)

Page 9

others' that would allow for the imposition of punitive damages in this case ."(Def.Mot.¶ 23.) In making this argument, Harris Bank ignores a number of Wilson's allegations. Wilson has specifically alleged that the Bank's conduct was "willful, wanton and in reckless disregard of the rights of others," (Compl.¶ 48), and has identified investigative steps the Bank failed to take and circumstances the Bank refused or failed to consider. (*See id.* ¶¶ 17-19.)Construing these allegations in Wilson's favor, as required at this stage, the court concludes the complaint supports an inference that the Bank acted willfully or wantonly. Harris Bank's motion to dismiss is denied as to Count V.

**D. Count VI**

In the final count of her complaint, Wilson claims that Harris Bank violated § 407(a) of the Social Security Act when it used $60.70 in social security funds that had been deposited directly into her checking account to pay overdraft fees resulting from the alleged unauthorized transactions. (*Id.* ¶¶ 21, 50-53.)Wilson alleges that the Bank's conduct "constitutes an illegal assignment and/or transfer in violation of Section 407(a) of the Social Security Act,"(*id.* ¶ 51), and that "Harris Bank's taking of plaintiff's social security benefits constitutes 'other legal process' and is thus prohibited by" § 407(a).(*Id.* ¶ 52.)Harris Bank has moved to dismiss Count VI, arguing that the Bank's use of funds that had Social Security benefits as their source does not constitute "other legal process" within the meaning of § 407(a). (Def.Mot.¶ ¶ 27-28.)

**\*9** In relevant part, § 407(a) states that the "right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to ... other legal process."42 U.S.C. § 407(a). Wilson urges that this provision identifies two different restrictions on the use of Social Security benefits. *See Wash. State Dep't of Social and Health Servs. v. Keffeler,* 537 U.S. 371, 383 n. 6,

123 S.Ct. 1017, 154 L.Ed.2d 972 (considering party's argument that benefits were improperly assigned under § 407(a) separately from the party's argument that benefits were taken by "other legal process" under § 407(a)). The court addresses, in turn, Wilson's claims that the Bank violated those restrictions.

**1. Transfer of the Right of Future Payment**

Wilson argues, first, that the Bank's conduct resulted in the improper transfer of a recipient's right to future Social Security payments in violation of the first clause of § 407(a). Because the court considers the first part of § 407(a) to be unambiguous-notably, the parties do not argue otherwise-the court will give effect to its plain language. *See United States v. Ranum,* 96 F.3d 1020, 1029 (7th Cir.1996) (court must give effect to plain meaning of clear and unambiguous statutes) (citation omitted). The words of the statute are clear: the prohibition on the transfer or assignment of Social Security benefits applies to "any future payment under [the] subchapter."42 U.S.C. § 407(a). Naturally, the Bank could not have used the Social Security funds at issue to pay Wilson's overdraft fees until after they were deposited into her checking account. Wilson does not allege otherwise. Thus, the court concludes that the Bank's conduct did not amount to an illegal assignment or transfer of *future* Social Security payments.

The cases cited by Wilson do not persuade the court that the Bank violates § 407 by collecting an overdraft fee from funds on deposit, whenever those funds originated from a monthly Social Security payment. The cases Wilson cites in support of this theory, *Hambrick v. First Security Bank,* 336 F.Supp.2d 890 (E.D.Ark.2004) and *In re Brewer,* No. 02-32068, 2002 WL 32917680 (Bankr.S.D.Ill. Aug.15, 2002) are not binding and are arguably distinguishable. The plaintiff in *Hambrick* alleged a violation of § 407(a)'s anti-assignment provision when the defendant credit union used Social Security funds that were directly deposited into the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff's closed bank account to offset the unpaid portion of a $ 37,600 promissory note and to pay a $ 405.40 account overdraft. *Id.* Denying the credit union's motion for summary judgment, the *Hambrick* court concluded that an "agreement, even one voluntarily entered into by Hambrick, that transferred or assigned his rights to future payment of Social Security benefits to First Security Bank to offset debts owed would violate § 407."*Id.* 893-94.The court is uncertain whether any similar agreement exists in this case: in her response brief, Wilson states that Harris Bank "presumably" appropriated her funds pursuant to a banking agreement, but acknowledged that she is not in possession of any banking agreement. (Pl. Resp. at 12 & n. 3.) In any event, Harris Bank has not suggested it is entitled to use funds deposited in Wilson's account as payment against an independent debt. The *Hambrick* court expressed uncertainty about whether a financial institution's use of Social Security funds from a consumer's account pursuant to an account agreement would be improper in all cases. 336 F.Supp.2d at 894 (suggesting there might be a "valid, effective contractual right" to set-off against an existing account).

*10 *Brewer* is similarly distinguishable. *Brewer* addressed a credit union's use of the plaintiffs' Social Security funds, which were automatically deposited into their credit union account, to pay their credit card debt and car loans. 2002 WL 32917680, at *1. Similar to *Hambrick,* the court disapproved of such a prior agreement for payment out of Social Security deposits against independent debt. *Id.* at *4. Notably, other courts have concluded that § 407 does not prohibit a bank from using Social Security funds to pay overdraft fees pursuant to a voluntarily-entered account agreement. *See, e.g., Lopez v. Wash. Mut. Bank,* 302 F.3d 900 (9th Cir.2002) (noting that the plaintiffs "voluntarily opened an account with the bank and executed an account holder agreement which outlined the terms and conditions of the bank's overdraft policies," and concluding that "each deposit to the account after an overdraft should [therefore] be treated as a volun-

tary payment of a debt incurred"). The court concludes that Wilson has not stated a violation of the first prong of § 407(a).

**2. Funds Subject to Other Legal Process**

Nor has Wilson stated a claim for a violation of the other prohibition of § 407(a), which provides, in relevant part, that "none of the moneys paid or payable or rights existing under this subchapter shall be subject to ... other legal process."Wilson's claim that the Bank's use of her Social Security funds to pay the overdraft fee involves "other legal process" is defeated by the Supreme Court's holding in *Keffeler.*In that case, the Court held that the state's use of the Social Security funds of foster children in order to reimburse the state for expenditures in connection with the foster children's care did not involve "other legal process" under § 407(a).*Id.* at 375.The Court construed "legal process" narrowly and explained that it should be understood

much like the processes of execution, levy, attachment, and garnishment and, at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

*Id.* at 385.The Court also emphasized that legal processes "typically involve the exercise of some judicial or quasi-judicial authority to gain control of another's property."*Id.* at 386.

Wilson argues that in collecting an overdraft fee from her account, the Bank was aiming to discharge what could be characterized as an enforceable obligation. But, under *Keffeler,* the presence of an enforceable claim is not enough to establish that "other legal process" was involved in the appropriation of funds whose source is a Social Security payment. The Bank's use of Wilson's funds must also have involved a judicial or quasi-judicial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mechanism. The court concludes that it did not.

**\*11** According to Wilson, the Bank's action "was quasi-judicial in nature because, in deciding that it could use Plaintiff's social security benefits to pay its overdraft charges, Harris unilaterally decided an issue that a court could have decided"-whether the Bank "could setoff Plaintiff's benefits pursuant to agreement or common law."(Pl. Resp. at 14.) In the court's view, Wilson's view of a quasi-judicial mechanism is overly broad. Naturally, a quasi-judicial process is one that is like or similar to a judicial or adjudicative process. For example, non-judicial officials can be granted judicial immunity for "quasi-judicial conduct" when their duties "have an integral relationship with the judicial process."*Henry v. Farmer City State Bank,* 808 F.2d 1228, 1238 (7th Cir.1986) (citation omitted).[FN9] In this case, the court cannot conclude that the Bank's withdrawal of funds already in Wilson's account to pay an overdraft fee resembles a judicial action. It is reasonable to assume that a consumer incurs an overdraft fee each time the withdrawals to an account exceed its balance; there is nothing adjudicative about such a process. If the court were to consider this process to be quasi-judicial in nature, it would effectively preclude banks from charging any fees-overdraft or otherwise-against any consumer whose account may include deposits from Social Security payments. The court declines to construe the term "quasi-judicial" so expansively.

> FN9. Wilson cites *Washington Federation of State Employees v. State Personnel Board,* 23 Wash.App. 142, 145-46, 594 P.2d 1375, 1378 (Wash.App. Div. 2 1979), which sets forth factors to determine whether an agency's actions are quasi-judicial. (Pl. Resp. at 14.) While administrative agencies routinely perform quasi-judicial functions, Wilson does not argue and cites no cases to explain why this court should find a financial institution's imposition of an overdraft fee to be similar to the quasi-judicial conduct of administrative agencies.

Wilson attempts to characterize the overdraft fee as a "setoff" and cites pre-*Keffeler* cases concluding that a bank setoff constitutes "other legal process." (Pl. Resp. at 14-15.) The court does not find these cases persuasive. In both *Tom v. First American Credit Union,* 151 F.3d 1289, 1291 (10th Cir.1998) and *Marengo v. First Massachusetts Bank,* 152 F.Supp.2d 92, 93 (D.Mass.2001), (as in *Hambrick* and *Brewer* ), the banks used consumers' Social Security funds to satisfy separate pre-existing debts not related to the consumers' checking accounts. Such facts are dissimilar to this case where an overdraft fee was withdrawn from the overdrawn checking account itself.*Lopez* presented the latter situation and distinguished *Tom* on the same basis. 302 F.3d at 906. In *Lopez,* the court concluded that the defendant's practice of using the plaintiffs' direct Social Security deposits to pay account overdrafts and overdraft fees did not violate § 407(a).*Id.* at 904.This court adopts that conclusion, as well.

Because Wilson has not sufficiently alleged an illegal transfer or assignment of further Social Security payments or that the Bank's appropriation of her funds involved "other legal process," Harris Bank's Motion to Dismiss is granted as to Count VI.

### CONCLUSION

For the reasons discussed above, Harris Bank's motion to dismiss (17) is granted as to Counts II, III, and VI, and denied as to Counts IV and V. Plaintiff has leave to file an amended complaint, if any, on or before September 26, 2007.

N.D.Ill.,2007.
Wilson v. Harris N.A.
Slip Copy, 2007 WL 2608521 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2

**Westlaw.**

Not Reported in A.2d                                                        Page 1
Not Reported in A.2d, 2005 WL 2122304 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 2122304)**

**c**                                                ATIONS, INC, et al.
Freedman v. Advanced Wireless Cellular Communica-      **No. SOM-L-611-02.**
tions, Inc.
N.J.Super.L.,2005.                                     June 24, 2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES        MEMORANDUM OF DECISION
BEFORE CITING.

Superior Court of New Jersey, Law Division.    DERMAN, J.
The Law Offices of Michael A. FREEDMAN
v.
ADVANCED WIRELESS CELLULAR COMMUNIC-
MOVANT:                                        DEFENDANT (Advanced Wireless

Cellular Communications, Inc.)

MOVANT'S ATTORNEY:                             Paul D. Drobbin, Esq.

St. John & Wayne, L.L.C.

OPPONENT:                                      PLAINTIFFS

(The Law Offices of Michael A.

Freedman, P.C., et al.)

OPPONENT'S ATTORNEY:                           Olimpio Lee Squitieri

Squitieri & Fearon, LLP

ORAL ARGUMENT:                                 NO
FACTS AND PROCEDURAL HISTORY                   toll free telephone number used by Fax.com.

**\*1** On or about August 29, 2001, October 2, 2001,     On or about January 10, 2002 Fax.com, on behalf of
December 6, 2001 and January 11, 2002, Defendant     Advanced, caused an unsolicited advertisement to be
Fax.com ("Fax.com"), on behalf of Defendant Ad-      sent to Plaintiff Freedman via facsimile. The advertise-
vanced Wireless Cellular Communications, Inc.        ment identifies the advertiser as Advanced Communica-
("Advanced"), caused unsolicited commercial advertise-  tions and provides a phone number to call for activa-
ments to be sent to Plaintiff Legal Papers, Inc.     tion. This is a telephone number used by Advanced. The
("Plaintiff") via facsimile. The advertisements identify  advertisement also provides a toll free number at the
the advertiser as Advanced Communications and        bottom of the advertisement for recipients to call if a re-
provide phone numbers to call for activation. These are  cipient desires to have his or her number removed from
telephone numbers used by Advanced. The advertise-   the database of fax telephone numbers. This is a toll
ments also provide a toll free telephone number at the  free telephone number used by Fax.com.
bottom of the advertisements for recipients to call if a
recipient desires to have his or her number removed    In the case at bar, Plaintiff brought a claim for violation
from the database of fax telephone numbers. This is a  of the Telephone Consumer Protection Act ("TCPA"),
                                                     47 *U.S.C.* § 227(b)(1)(C). On or about December 16,
                                                     2004, this court was asked to grant class certification

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 2
Not Reported in A.2d, 2005 WL 2122304 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 2122304)**

and default judgment to Plaintiff in regard to these claims. Subsequently, this court entered an order certifying a class action and awarding default judgment in the amount of $20,000,000 plus attorney fees. Advanced now brings this motion to vacate this court orders certifying the class and awarding the default judgment pursuant to Rule 4:50-1.

## MOVANT'S POSITION

Advanced initially argues that the orders certifying the class and awarding default judgment should be denied because there is evidence of excusable neglect on its part. In addition, Advanced argues that the orders should be vacated because a plaintiff cannot pursue a class action under the TCPA.

## OPPONENT'S POSITION

Plaintiffs argue that procedural history of this matter does not evidence excusable neglect on the part of Advanced. Plaintiffs assert Advanced was kept on continual notice with regard to the procedural developments in this case and that it cannot therefore provide an excuse adequate to permit the court to vacate its previous orders. In addition, Plaintiffs argue that Advanced's contention that the TCPA does not permit class action is based on unreported decisions of this State's courts which do not constitute precedent binding on this court.

## LEGAL ANALYSIS

As an initial matter, this court will address its previous order for class certification. At the time Plaintiffs previously moved for class certification, this court found, in a vacuum of an unopposed motion, that Plaintiffs had sufficiently established Rule 4:32-1(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. This court also determined that common issues predominated over individual issues and that the class action device provided a superior means for adjudicating this controversy.

**\*2** Although it failed to oppose those motions, Ad-

vanced's current papers indicate that this determination was not totally accurate. There is significant support evidenced by the legislative history of the TCPA for concluding that class actions were not intended under the Act. The legislative history of the TCPA indicates that the Senate envisioned the act as providing a private right-of-action to consumers receiving unsolicited faxes and that it intended those consumers to pursue the statutory damages of $500 in small claims court without an attorney. 137 Cong. Rec. S 16205-06 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings).

Several courts have interpreted this legislative history as foreclosing the possibility of bringing a class action under the TCPA. One of the requirements for class certification is that a plaintiff must demonstrate that the class action, as opposed to alternative procedures, provides a superior means for adjudicating the controversy. Rule 4:32-1(b)(3). Determining whether a class action is superior to an alternative procedure necessitates:

(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method.

[*In Re Cadillac V8-6-4 Class Action,* 93 *N.J.* 412, 436 (1983) ].

In holding that a class action could not proceed under the TCPA, one Federal District Court determined that:

The statute provides for a *minimum* recover of $500 for each violation as well as treble damages if the plaintiff can prove willful or knowing violation. 47 *U.S.C.* § 227(b)(3). This most likely exceeds any actual monetary loss in paper, ink or lost facsimile time suffered by most plaintiffs in such a case. The statutory remedy is designed to provide adequate incentive for an individual plaintiff to bring suit on his own behalf.... A class action would be inconsistent with the specific and personal remedy provided by Congress to address the minor nuisance of unsolicited facsimile advertisements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2122304 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 2122304)

Page 3

[*Forman v. Data Transfer, Inc.,* 164 *F.R.D.* 400, 404-05 (E.D.Pa.1995).

The majority of courts that have considered the vitality of class actions under the TCPA have similarly held that class actions are invalid. *See,e.g.,Livingston v. U.S. Bank, N.A.,* 58 *P.3d* 1088 (Ct.App.Colo.2002) (finding class action is inappropriate because individual issues predominate over common issues in cases involving unsolicited faxes under the TCPA); *Kondos v. Lincoln Property Co.,* 110 *S.W.3d* 716 (Tex.App.2003) (same); *Kenro, Inc. v. Fax Daily, Inc.,* 962 *F.Supp.* 1162 (S.D.Ind.1997) (same).*ButseeESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.,* 203 *Ariz* .94, 100-02 (Ariz.App.Div.2002) (finding that Congress provided no express exclusion of class action relief under the TCPA. In addition, in an unreported decision, the New Jersey Appellate Division has indicated that class actions are impermissible under the TCPA. In *Levine v. 9 Net Ave., Inc.,* 2001 WL 34013297 (App.Div.2001), the court found that:

**\*3** the superiority prong of a class action is undermined where there is a readily available individual remedy.... Under the TCPA private action provision, the proofs are simple, the costs low, the injury small, and the $500 damage award is attractively disproportionate to the extent of the actual injury.

[*Id.,* at \*6].

Although this court recognizes that neither these out-of-state reported decisions nor the Appellate Division unreported decision constitute precedent on this court, the analysis of the weaknesses of class action claims proceeding under the TCPA is equally relevant and applicable to the case at bar. As such, as an initial matter, this court finds that its previous conclusion that Plaintiff's adequately met the requirements for class certification in the case at bar was clearly in error.

Furthermore, this court's own review of the issue, briefed fully by Advanced, is consonant with these decisions. The receipt of an unwarranted fax is a trivial annoyance. Most individuals just "toss" the document. Those sufficiently aggrieved because of the use of their

fax machine or ink or motivated to receive the treble award, if they prove willfulness, have an adequate remedy. The Legislative history reads, "The amount of damages in this legislation is set to be fair to both consumer and the telemarketer." 137 Cong. Rec. S. 16205-06, *supra.*

In its moving papers, Advanced argues that it should be provided relief from this court's previous orders pursuant to Rule 4:50-1. *R.* 4:50-1 provides that "the court may relieve a party or a party's legal representative from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect ... (f) any other reason justifying relief from the operation of the judgment or order."The New Jersey Supreme Court has indicated that "[a] court should review 'the opening of default judgments ... with great liberality,' and should tolerate 'every reasonable ground for indulgence ... to the end that a just result is reached." ' *Mancini v. EDS,* 132 *N.J.* 330, 334 (1993), *quotingMarder v. Realty Constr. Co.,* 84 *N.J.Super.* 313, 319 (App.Div.), *aff'd*43 *N.J.* 508 (1964).

This case has a dizzying procedural history, which Advanced argues justifies relief from this court's previous orders. Advanced contends that there is a significant amount of confusion regarding a previous motion to dismiss, the withdrawal of Advanced's former representation (Cozen, O'Connor), various dismissals for lack of prosecution, the notices provided to Kemper Insurance (who is providing coverage to Advanced), and the notices actually received by Advanced, and a confusion of addresses for Advanced. Advanced argues that this convoluted procedural history evidences the requisite excusable neglect necessary to vacate this court's previous orders. It is not entirely clear that this procedural history adequately represents a case of excusable neglect, especially given Advanced's arguably dilatory approach to obtaining new counsel following the withdrawl of Cozen O'Connor, although Advanced may have been confused by the several administrative dismissals which occurred in this protracted procedural history. This court, however, need not make such a determination because sufficient grounds exists to vacate the previous orders under *R.* 4:50-1(f).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4
Not Reported in A.2d, 2005 WL 2122304 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 2122304)**

**\*4** Rule 4:50-1(f) provides that a judgment or order may
be vacated for any reason justifying such relief. Relief
is available under the catchall provision of *R.* 4:50-1(f)
only when truly exceptional circumstances are present.
*A.B. v. S.E.W.,* 175 *N.J.* 588, 593 (2003). A party mov-
ing under Rule 4:50-1(f) must demonstrate that the en-
forcement of the judgment or order would be unjust, op-
pressive or inequitable. *Quagliato v. Bodner,* 115
*N.J.Super.* 133, 138 (App.Div.1971). Based on the fore-
going description of this court's previous error with re-
gard to class certification, exacerbated by its inexplic-
able error in accepting the proposed measure of dam-
ages as $20,000,000 instead of the lower, but intellectu-
ally justifiable $15,000,000, this court finds that the
magnitude of Defendant's exposure pursuant to this
court's previous orders as compared to the exposure ap-
parently intended by Congress and the harm suffered by
Plaintiff represents exceptional circumstances for
providing relief from those previous orders. It would be
manifestly unjust to subject Advanced to a $23,000,000
judgment (including attorney's fees) for damages to an
entire class of plaintiffs when Congress intended dam-
ages of $500 to be pursued by individual plaintiffs.

For these reasons, Advanced's Motion to Vacate is
GRANTED. This court's December 16, 2004 orders
granting class certification and default judgment are
hereby vacated. Further, Plaintiff's class allegations are
stricken with prejudice.

N.J.Super.L.,2005.
Freedman v. Advanced Wireless Cellular Communica-
tions, Inc.
Not Reported in A.2d, 2005 WL 2122304 (N.J.Super.L.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2000 WL 976656 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 976656)**

**H**
Himmelman v. MCI Communications Corp.
D.D.C.,2000.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Curt HIMMELMAN, Plaintiff,
v.
MCI COMMUNICATIONS CORPORATION, De-
fendant.
**No. CIV. A. 99-1705(RMU).**

June 1, 2000.

Andrew N. Friedman, Cohen, Milstein, Hausfeld &
Toll, PLLC, Washington, D.C., Liaison Counsel for
the plaintiff, Curt Himmelman.
Joshua N. Rubin, Abbey, Gardey & Squitieri, LLP,
New York, NY, Co-Counsel for the plaintiff, Curt
Himmelman.
Jeffrey M. Gottlieb, Berger & Gottlieb, New York,
NY, Co-Counsel for the plaintiff, Curt Himmelman.
Benjamin S. Boyd, Piper & Marbury L.L.P., Wash-
ington, D.C., Co-Counsel for the defendant, MCI
Communications Corporation.
Charles P. Scheeler, Piper & Marbury L.L.P., Bal-
timore, MD, Co-Counsel for the defendant, MCI
Communications Corporation.

MEMORANDUM OPINION AND ORDER

Denying the Plaintiff's Motion for Reconsideration

URBINA, District J.

I. INTRODUCTION

**\*1** By Memorandum Opinion and Order issued
February 10, 2000, this court dismissed the com-
plaint, without prejudice, out of deference to the
primary jurisdiction of the Federal Communications
Commission ("FCC"). The plaintiff has filed a mo-
tion for reconsideration pursuant to Federal Rule of
Civil Procedure 59(e), contending that the action
should be merely stayed rather than dismissed. For

the reasons which follow, the court will deny the
motion for reconsideration.[FN1]

> FN1. For the factual background and pro-
> cedural history of this controversy, the
> court relies on the discussion set forth in
> the February 10, 2000 Memorandum Opin-
> ion. The court also refers the parties to that
> Opinion's discussion of the doctrine of
> primary jurisdiction.

II. LEGAL STANDARD AND DISCUSSION

"A motion for reconsideration is discretionary and
should not be granted unless the movant presents
either newly discovered evidence or errors of law
or fact which need correction."*National Trust v..
Department of State,* 834 F.Supp. 453, 455
(D.D.C.1993) (internal citation omitted). Moreover,
a motion for reconsideration should not be granted
if a party is simply attempting to renew factual or
legal arguments that it asserted in the original
pleadings.*Id.* "Reconsideration is not simply an op-
portunity to reargue facts and theories upon which a
court has already ruled."*State of New York v.
United States,* 880 F.Supp. 37, 38 (D.D.C.1995);
*see also Association Archives and Research Center
v. DOJ,* 828 F.Supp. 100, 102 (D.D.C.1993). In
fact, to succeed on a Rule 59(e) motion, a party
must demonstrate an "intervening change in con-
trolling law, the availability of new evidence, or the
need to correct a clear error or prevent manifest in-
justice."*Virgin Atlantic Airways, Ltd. v. National
Mediation Board,* 956 F.2d 1245, 1255 (2d Cir.),
*cert. den.,*506 U.S. 802 (1982).

The plaintiffs have not made the requisite showing.
The plaintiffs do not point to any intervening
change in the applicable law or to any new evid-
ence. Rather, the plaintiff asserts that "the class
period extends to the very beginning of the stat-
utory limitations period and ... therefore, *any* period
during which the action is not pending in this Court
would result in the loss of rights by members of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 976656 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 976656)**

Page 2

class whose causes of action accrued at the beginning of the class period."*See* Pl.'s Mot. for Recon. at 1. The court notes first that the plaintiff did not raise this point in its opposition to the defendant's successful motion to dismiss. *See FDIC v. World Univ., Inc.,* 978 F.2d 10, 16 (1st Cir.1992) ("Rule 59(e) motions are aimed at *re* consideration, not initial consideration"). In any event, the court never certified the putative plaintiff class, so there is no basis for proceeding as though the class were a legally cognizable entity. Considerations of potential harm to such a hypothetical class is simply too remote and speculative to justify reversing the proper dismissal of Mr. Himmelman's action.

Speculative harm to a putative class aside, the court emphasizes that the prior Opinion raised *sua sponte* the issue of potential prejudice to the plaintiff himself. Significantly, the plaintiff does not contest the court's analysis, nor its conclusion that dismissal will not subject him to a time bar should he seek a judicial forum following FCC proceedings. Consequently, the court sees no reason to revisit the issue of potential prejudice to the plaintiff.

**\*2** In short, the plaintiff has not provided a basis for disturbing this court's conclusion that he is not unfairly disadvantaged by the dismissal without prejudice. *See Access Telecommunications v. Southwestern Bell,* 137 F.3d 605, 608 (8th Cir.1998) (district court did not err in deferring to FCC and dismissing rather than staying action pursuant to doctrine of primary jurisdiction); *see also*47 U.S.C. § 208(a) (plaintiff can petition directly to the FCC); 47 U.S.C. § 208(b)(1) and (2) (FCC will be obligated to investigate the plaintiff's complaint and issue an order within prescribed time periods); 47 U.S.C. § 208(b)(3) and § 402(a) (FCC order is final and appealable); [FN2]28 U.S.C. § 2342(1), § 2343; § 2344 (if aggrieved by FCC's decision, plaintiff may petition for review in a court of appeals of proper venue within sixty days of the FCC's order).

> FN2. If either party is dissatisfied with the speed of the agency's deliberations, he may seek relief under section 10(e) of the Ad-

ministrative Procedure Act, 5 U.S.C. § 706, which authorizes the federal courts to "compel agency action unlawfully withheld or unreasonably delayed."*See*589 F.Supp. 729, 732 n. 2. "[T]he solution to agency inaction lies with the court of appeals."*Bell Atlantic v. MFS Communications co.,* 901 F.Supp. 835, 853 (D.Del.1995). As the Third Circuit has reasoned, "We think it is clear ... that the statutory commitment of review of FCC action to the Court of Appeals, read in conjunction with the All Writs Act, 28 U.S .C. § 1651(a), affords this court jurisdiction over claims of unreasonable Commission delay."*Telecommunications Research and Action Ctr.,* 750 F.2d at 75.

III. CONCLUSION

For the foregoing reasons, the court denied the plaintiff's motion for reconsideration by Order dated May 31, 2000. This Memorandum Opinion is executed and issued on the 1st day of June, 2000.

ORDER

Denying the Plaintiff's Motion for Reconsideration

The plaintiff has moved for reconsideration of this court's February 10, 2000 Memorandum Opinion and Order, which dismissed the complaint without prejudice out of deference to the primary jurisdiction of the Federal Communications Commission. For the reasons set forth in this court's Memorandum Opinion separately and contemporaneously executed and issued this 31st day of May 2000, it is

ORDERED that the plaintiff's motion for reconsideration shall be and hereby is DENIED; and it is

FURTHER ORDERED that this matter be removed from this court's docket.

SO ORDERED.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 3
Not Reported in F.Supp.2d, 2000 WL 976656 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 976656)**


D.D.C.,2000.
Himmelman v. MCI Communications Corp.
Not Reported in F.Supp.2d, 2000 WL 976656
(D.D.C.)

END OF DOCUMENT

`

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.